ISEMAN v. SOUTH CAROLINA AND GEORGIA R. R. CO.

1. RAILROADS—PASSENGER—BURDEN OF PROOF.—THE PRESUMPTION is that a person on board of a passenger train is a passenger and not a trespasser, and the burden of showing he is a trespasser is on the carrier.

2. IBID.—IBID.—NONSUIT.—There being facts here tending to show that plaintiff was a passenger and not a trespasser, nonsuit was improper.

Before KLUGH, J., Richland, November, 1897.   Reversed.

Action by Ben Iseman *v.* The South Carolina and Georgia R. R. Co.   From judgment of nonsuit plaintiff appeals.

*Messrs. Barron & Ray* and *Andrew Crawford*, for appellant, cite: 10 Ex., 376; 34 A. & E. R. R. Ca., 515; 46 N. Y., 23; 9 A. & E. R. R. Ca., 364; 51 S. C., 150; 57 Pa. St., 339; 2 A. & E. R. R. Ca., 108; 26 Id., 173; 58 Id., 15; 86 Pa. St., 139.

*Mr. Jos. W. Barnwell,* contra, cites: 38 S. C., 1; 48 S. C., 1; 47 N. Y., 274; 48 S. C., 421.

July 7, 1898.   The opinion of the Court was delivered by

MR. JUSTICE GARY.   The appeal herein is from an order of nonsuit.   The first paragraph of the complaint alleges the corporate existence of the defendant.   The second paragraph alleges that the defendant is a common carrier of passengers between Charleston and Columbia.   The other allegations are as follows: "III. That on the afternoon of the 21st day of June, 1896, the plaintiff boarded the defendant's train at Charleston, S. C., for the purpose of taking passage to Columbia, having previously purchased a ticket from Charleston to Columbia, and the defendant having received its usual charge for said ticket and transportation between said places.   IV. That when the said train had gotten only a few miles from Charleston, the defendant's agent in charge of the said train demanded of the plaintiff his fare, and refused to accept their aforesaid ticket, which the plaintiff tendered to him, and which he had purchased in good faith; but the plaintiff, well knowing that his ticket was perfectly good, and that defendant had received its usual charge therefor, declined to pay any more, and persisted in riding on his said ticket.   V. That thereupon the defendant caused its train to be stopped between stations, and at a place with no shelter or convenience for passengers, and while it was then raining, and with intent to degrade, humiliate, mortify, and wound the plaintiff in his

person and feelings, caused him to be forcibly ejected from the said train, violently, wilfully, and unlawfully, and without regard to the rights of the plaintiff, and with a design to injure and oppress him in the exercise of his lawful rights. VI. That after the plaintiff had been so unlawfully and violently ejected from the said train, he again entered it, and, under protest, paid in money the fare demanded of him by the conductor to Branchville. That thereafter, and after proceeding some distance, the defendant's agent, who had ejected him, approached the plaintiff, refunded him the money he had paid him to Branchville, and asked for his ticket, which he had before refused, which said ticket he then punched and returned to the plaintiff, and recognized the said ticket as good and valid for passage from Charleston as far as Branchville. VII. That after leaving Branchville, another conductor in the employment of the defendant, and who then had charge of the said train, or car, on which the plaintiff was traveling from Branchville to Columbia, accepted the aforesaid ticket as passage from Branchville to Columbia, it being the identical ticket that plaintiff had tendered before he was ejected from the train. VIII. That by the aforesaid wrongful and unlawful acts and violence of the defendant, and disregard of the plaintiff's rights, the plaintiff has been injured in his person and feelings to his damage $5,000."

That portion of the testimony which is material to a consideration of the exceptions, is so interwoven with other testimony, which, more or less, throws light upon it, that we deem it necessary to set out the testimony somewhat at length. We, therefore, quote from the case as follows: "Ben Iseman, sworn, says: By Mr. Barron: Q. You are the plaintiff in this case? A. Yes, sir. Q. Mr. Iseman, what was your business in the summer, in the month of June, 1896? A. Ticket broker in Columbia, S. C., and paid a license to do that business. Q. Where were you on Sunday, 21st June, 1896? A. I was in Charleston, sir. Q. When did you leave Charleston? A. At 5.30 on the 21st.

Q. On what road?   A. South Carolina and Georgia road. Q. Where did you board the train?   A. At Line street station, Charleston.   Q. What car did you enter?   A. First class car.   Q. State what occurred after that?   A. The conductor came in and hollered out 'tickets.'   When he arrived in the car, he came up to me.   I pulled out the ticket out of my pocket and offered it to him, and he refused to accept it; I asked him on what ground; he said it was a scalper's ticket, and demanded his fare; I refused to give it to him; he walked out the door and came back, and he made the demand again for the fare, and I refused to give it to him again, knowing full well I had used these tickets before—  Mr. Barnwell objected. Witness: He stopped the train and demanded fare again; he demanded the fare, and I refused to give it to him, and he stopped his train and said, 'Come on;' I refused to do it; I told him he would have to take hold of me; and he caught hold of me and got out in the aisle and said, 'come on;' I refused to go without he took me; got on the platform, and he pushed me off. Q. Where was that train at that time?   A. A short distance from Charleston.   Q. At any station?   A. No, sir; I don't remember the number of miles, it was near Magnolia Cemetery.   Q. What was the condition of the weather?   A. Drizzling rain.   Q. How many passengers were on the train?   A. I can't state the number, but the cars were full. Q. The coach you were riding in was pretty full of passengers?   A. Yes, sir.   Q. State now what was the manner in which you were put off?   A. He was very rough about it; seemed very determined; he was very ungentlemanly about it, in other words * * *   Q. What did you then do?   A. I went back in the car and took a seat I had vacated; the conductor came to me again and demanded his fare; I refused to give it to him unless he would give me a receipt for it; at first he didn't agree to do it, but afterwards gave me a receipt.   Mr. Barnwell: We object; we want the receipt.   Mr. Barron: Q. What became of that receipt?   A. The conductor got it back.   Q. State what occurred after

you had paid your fare and taken this receipt? Mr. Barnwell: My friend has not produced the ticket yet. Witness: He went through collecting his fare; he got near Branchville, which is the destination from Augusta—he ran on part of the train as far as Branchville—he came back to me and said he would accept the ticket that he had put me off on. Mr. Barnwell: We object to any testimony about that ticket unless produced, or unless they prove it was lost. Mr. Barron: I am not trying to prove the contents of the tickets. * * * Q. State what occurred between you and the conductor in reference to this matter thereafter? A. He came back to me and said he would accept the ticket that he had put me off on, for the passage. Q. What did he do with the ticket? A. Punched it and returned it to me. Q. What else did he do? A. He took the receipt he gave me; he put his hand in his pocket to get the money and he said, 'I haven't got the change; will bring it in a minute.' Accepted the receipt; went in the second car; while I was talking to Mr. Eleazor and his wife, he put the money in my pocket. Q. The amount you had paid him? A. Yes, sir. Q. You had already given up the receipt. A. Yes, sir. I staid on the car from Branchville to Columbia, the other conductor of the same line came through and accepted it for passage. Q. You surrendered it for your passage to Columbia? A. Yes, sir. * * * Q. Did he say anything to you then? A. Yes, sir; he said he didn't propose to allow me to use the South Carolina and Georgia Railroad for convenience. * * * Cross-examination: Mr. Barnwell: Q. What is the ticket usually called? A. Sullivan Island and return ticket. Q. Where did you get the ticket from? A. I bought it. Q. Who from? A. A young lady in Charleston. Q. What did Capt. Roach say about that ticket—did he not say to you that the ticket was not transferable? A. No, sir, he did not. Q. What do you mean by a scalper's ticket—he said, you say, that you could not ride on a scalper's ticket—what is a scalper's ticket? A. More than one person uses it—one portion of it. Q. It is a ticket purchased by one person,

and used by another? A. Yes, sir. Q. Didn't Capt. Roach tell you before you got on the train that he was not going to let you ride on that ticket? A. Yes, sir. Q. He warned you that he was not going to let you ride on it? A. But he had not seen it. Q. Did you tell him what kind of ticket it was? A. I did not. Q. Why was it he said you should not ride on the train? A. He said it was a scalper's ticket. Q. In the depot in Charleston? A. No, sir, in the car. Q. In the depot in Charleston why did he say he was not going to let you ride? A. He said, damned if he proposed to let me use the South Carolina and Georgia for convenience. He did not give any explanation; he had not seen the ticket. Q. Didn't he tell you the reason that you were not going to be allowed to ride on that ticket was because you had not purchased the ticket, and it was a non-transferable ticket? A. No, sir. Q. You are positive he didn't tell you that? A. I am. Q. When you got on the train, he came to take up your ticket? A. Yes, sir; he had been through the other cars. Q. Did he not tell you that you could not ride on the ticket because it was non-transferable? A. No, sir; he said it was a scalper's ticket. * * * Q. You didn't ask the conductor to carry you on the same ticket again after he first put you off? A. No, sir. Q. You had no further conversation with him? A. When he came back in the car he told me he done it as a joke. Redirect-examination: Q. It was after Capt. Roach had been in that car where Capt. Gilbert was and came back, that he told you it was a joke? A. Yes, sir; he had been in the second class car; that was when we got near Branchville."

Upon the motion for a nonsuit made at the close of plaintiff's testimony, the presiding Judge ruled as follows: "The action is for damages for violation of plaintiff's rights. The plaintiff is bound to show, in the first instance, that he had the right to be a passenger, which must be secured by the payment of money, or he must show some other voucher, as it has been well called, entitling him to be on the train; and if there be such voucher, he must either

show that the voucher was lawful and absolutely established his right; or, if he is unable to produce the voucher itself, he must show the contents of the voucher. In brief, the plaintiff must make out by a *prima facie* case the right which he alleges has been invaded. The evidence in this case is that this plaintiff was on board of the train of the South Carolina and Georgia Road, and that he had a ticket. So far as I recollect the testimony, so far as I caught it, there is no testimony going to show what that ticket was except it was something to Sullivan Island—a round trip ticket. I do not think the testimony has made out the plaintiff's right to such an extent as that the jury could say that the right has been violated; and that being the view which I take of the matter, I am constrained to grant the motion for a nonsuit."

The plaintiff appealed upon the following exceptions: "1. That his Honor erred in granting the nonsuit. 2. That his Honor erred in holding that the plaintiff had not made out by the testimony a *prima facie* case, showing his right to be carried as a passenger on defendant's train, and that said right had been violated. 3. That his Honor erred in not leaving it to the jury to determine, under the testimony, whether the relation of passenger and carrier existed between plaintiff and defendant at the time of the expulsion of the former from the latter's train, and whether plaintiff's rights arising out of said relation had been violated. 4. That his Honor erred in holding that plaintiff, under his proof, was not entitled to have the jury pass upon the question, 'whether or not he was entitled to recover under the pleadings in the action against the defendant company.' "

The principal question in the case is whether there was any testimony whatever tending to establish the fact that the plaintiff was a passenger at the time he was ejected from the train. It is not contended by the defendant that the plaintiff was on board a train which did not carry passengers, nor that he, after boarding the train, occupied an unusual place thereon, or, in short, that he

did anything which prevented him from becoming a passenger, except the alleged refusal to pay his fare, or to present such a ticket as entitled him to the rights of a passenger. There was, therefore, nothing, in the first instance, to prevent the application of the rule that the presumption was in favor of the plaintiff that he was a passenger and not a trespasser. This rule is thus stated in 5 Am. & Eng. Enc., 488 (second edition), to wit: "Every person traveling in a railroad car or other public conveyance used for passenger carriage, and not connected with the railroad company or carrier, is presumed to be there lawfully as a passenger, and the burden is on the carrier to prove that he is a trespasser." The defendant contended that the ticket presented by the plaintiff was not such as entitled him to the rights of a passenger. The ticket was not introduced in evidence, and its provisions are, therefore, not the subject of construction by this Court. As the presumption was in favor of the plaintiff that he was a passenger, and as the ticket, upon which the defendant relied to destroy this presumption, was not introduced in evidence, it follows, from these facts alone, that there was error in granting the nonsuit.

There are, however, other circumstances showing error in granting the nonsuit. A conductor is the representative of the company, and his acts, within the scope of his employment, are as binding upon the company as if done by the company itself. There was testimony to the effect that after the plaintiff was ejected from the train, the conductor refunded him the money which he had been required to pay for his fare, and accepted the ticket which he punched; also that the ticket was accepted by a second conductor, who was in charge of the train from Branchville to Columbia, and no other fare was required of the plaintiff; also that the conductor said it was a joke when he ejected the plaintiff from the train; also that the only objection urged against the ticket was that it was a scalper's ticket. The acceptance, punching and retention of the ticket by the representatives of the company, furnished, at least, some evidence

that it was such as entitled the plaintiff to the rights of a passenger. Again, the objection to the ticket on the ground that it was a scalper's ticket, tended to show that the defendant waived all other grounds of objection to it. The statement of the conductor that the ejection of the plaintiff from the train was intended merely as a joke, tended to show that there was a waiver of the right to insist upon the illegality of the ticket, and that the plaintiff was unlawfully and wantonly removed from the train. In the case of *Martin* v. *Southern Ry. Co.*, 51 S. C., 150, the Court says: "Whether the plaintiff was a passenger or a trespasser, depended upon the inference to be drawn from the testimony, under proper instructions from the Court, and was peculiarly a matter for the consideration of the jury." In this case, the facts were such as should have been submitted to the jury.

It is, therefore, the judgment of this Court, that the order of nonsuit be set aside, and the case remanded for a new trial.